Casey, C. J.,
delivered the opinion of the court:
This is an action brought to recover $150,000 damages for the alleged violation, by the defendants, of a contract for the purchase by them of one thousand bales of cotton, the property of the claimant. The facts and circumstances out of which the claim arises are as follows :
During the late war of the rebellion it was the settled policy of the United States to interdict and prevent all commercial intercourse and traffic with the inhabitants of the rebellious States. But by the acts of 13th July, 1861, (12 Stat. L., p. 255,) and 2d July, 1864, (13 Stat. L., p. 377,) an exception to this policy was established, inasmuch as the President was authorized to permit “ commercial intercourse in such articles, and for such time, and by such persons, as he, in his discretion, may think most conducive to the public interests.” These acts of Congress authorized the appointment of agents by the Secretary of the Treasury “ to purchase, for the United States, any products of States declared in insurrection, at such places therein as shall be designated by him, at such prices as shall be agreed on with the seller, not exceeding the market value thereof at the place of delivery, nor exceeding three-fourths of the market value in the city of New York, at the latest quotations known to the agent;” and it was specially provided that “ no part of the purchase money for any products so purchased shall be paid, or agreed to be paid, out of any *190 other fund than that arising from property sold as captured, or abandoned, or purchased, and sold under the provisions of this act.” — (§ 8, Act 1864.) They also provided that “ such intercourse should be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury,” “ with the approval of the President.” — (12 Stat. L., p. 257, § 5; 13 Id., p. 376, § 11.)
Under these statutes and regulations the claimant, on the 20th-De-cember, 1864, entered into an agreement with one of the purchasing agents of the United States, which was set forth in the following certificate :
“ I, H. A. Risley, agent for the purchase of products of insurrec-tionary States, on behalf of the government of the United States, at Norfolk, do hereby certify that I have agreed to purchase from G. W. Lane, of Norfolk, Virginia, one thousand bales of cotton, which products it is represented are, or will be, at Chowan river, in the State of North Carolina, on the 1st day of January, 1865, and which he stipulates shall be delivered to me, unless prevented from so doing by the authority of the United States.
“ I therefore request safe conduct for the said G. W. Lane and his means of transportation and said products from Chowan river to Norfolk, Virginia, where the products so transported are to be sold and delivered to me under the stipulation referred to above, and pursuant to regulations prescribed by the Secretary of the Treasury:
“ H. A. RISLEY, Purchasing Agent.
■ “ D. W. C. FARRINGTON, Deputy.”
Upon the presentation of this certificate to the officer then in command at Norfolk, he issued the following safe conduct:
“ Headquarters DistRict of Eastern Virginia,
“ Norfolk, Va., December 20, 1864.
“ In accordance with the executive order relative to the purchase of products of insurrectionary States, permission is hereby granted to G. W. Lane to bring from Chowan river to Norfolk, Virginia, by route of Chesapeake and Albemarle canal, one thousand bales of .cotton.
“ The condition of this permit is, that the said products shall be delivered in Norfolk within three months from the date of this instrument, and be immediately on its arrival delivered and sold to the purchasing agent of the United States treasury, according to the executive order aforesaid, and subject to all regulations which do or may *191 exist in regard to said. pnrcbase; and said products sball have safe conduct and shall not be subject to detention, seizure, or forfeiture while being transported from the place and by the route aforesaid to Norfolk, Virginia.
“G. F. SHEPLET,
“Brigadier General Commanding.”
At the same time, and as a part of the same agreement, a sub-agent was appointed, whose authority and duty were defined by the following letter :
“Seventh Agency, TreasuryDepaRtment,
“Norfolk, Va., December 19, 1864.
“ Sir : You are hereby appointed an agent of the purchasing agency of the United States Treasury Department for the purpose and duties hereinafter designated, viz: You will proceed on hoard the steamer Philadelphia, now lying in this port, and in the capacity of supercargo proceed up the Chowan river, in North Carolina, to such points as are designated by Mr. G. W. Lane. On arriving at the said point of destination you will deliver the cargo (a schedule of which is hereto attached) to Mr. G. W. Lane, or order, provided and upon the condition that the said Lane shall deliver to you on board the said steamer three times the value of said cargo in cotton, which you will continue to hold in your possession until the same is delivered to me in Norfolk, Virginia. And all permits granted to Mr. G. W. Lane for the bringing in cotton and taking out supplies you will hold until the aforesaid cotton is safely within the military lines of the United States.
“ By order of
“ H. A. RISLEY, Purchasing Agent.
“D. W. 0. FARRINGTON, Deputy.
“ Thomas Upton, Esq.”
There was also a similar agreement between the parties, bearing date December 19, 1864, for the sale and purchase of one hundred bales of cotton. Under this certificate, a similar safe conduct had been granted by General Shepley, with the addition that it allowed the claimant to take to the Chowan river the goods described in an annexed schedule. This schedule was not signed or certified in any way ; its aggregate value was $10,442 86 ; and-among its items were “ ninety pairs common boots at $5, and five hundred and five pairs shoes at $1.”
*192 The claimant and the supercargo proceeded accordingly to the Chowan river, where the Philadelphia discharged her cargo, and took on hoard two hundred and fifty-seven hales of cotton. On the 10th January, 1865, as she was leaving Chowan river to go to Norfolk, she was seized by the United States steamer Yalley City, under orders issued by Commander Macomb, commanding the sounds of North Carolina, for carrying goods contraband of war. About this time a letter was received by Commander Macomb, from Rear-Admiral Porter, commanding the North Atlantic squadron, written, however, in ignorance of the seizure of the Philadelphia, which directed that where parties held permits from generals commanding adjoining districts, they should be allowed to go. Commander Macomb therefore, after General Shepley’s approval of the schedule had been obtained, allowed the Philadelphia to depart.
Before the Philadelphia arrived at Norfolk the report of her seizure reached Admiral Porter. A previous report, dated January 4, 1865, also had been made by Commander Macomb, which stated that on her way up the Chowan “ a guard of rebel soldiers was placed on board her to take her up in safety.” Accordingly, when the admiral became thus informed, he ordered that she be sent, with “ all the evidence against her, to New York.” She was, therefore, reseized, (February 1, 1865,) by the gunboat Ceres, and, being in a disabled condition, was sent, not to New York, but to Roanoke island.
The remaining events of the transaction will be best appreciated ,by being stated in their chronological order : On the 20th February, 1865, Admiral Porter ordered that the Philadelphia be turned over to “ some proper treasury agent.” On the 26th February the claimant addressed a communication to the Secretary of the Treasury, asking that “ his steamboat, named the Philadelphia, with her cargo of cotton, may be ordered to Norfolk, Virginia, in order that her cargo may be turned over to the agent of the Treasury Department for the purchase of cotton at that place;” and on the same day the supercargo, Upton, protested against the “ vessel being taken, with the cargo, to any other port than Norfolk.” On the 3d of March the Philadelphia reached Newbern, North Carolina, and was formally turned over by the navy to D. Heaton, supervising special agent of the Treasury Department for the sixth district, “ as captured property.” — (Heaton’s report.) “ Receipts were given in accordance with the treasury regulations, and measures taken to have the cotton put in proper order for shipment to the New York market.” On the same day the supercargo, Upton, again protested against being removed from the Phila *193 delphia. On the 15th March the Secretary of the Treasury, pursuant to the request of the claimant, wrote to Mr. Heaton : “ You are hereby directed, if the property has been turned over with charges of the nature above described, [‘ actual or intended violation of the acts of Congress, or the regulations of the Treasury Department,’] to cause it to be taken to some port within a district where an information may he .filed, and the rights of all parties may be decided by a court having legal jurisdiction.” On the 16th March the supercargo, Upton, pro-' tested against the removal of the cotton from the Philadelphia, “ as the cargo already belongs to the seventh agency, with headquarters at Norfolk, and of which I am in charge as special agent on board the said steamer.” On the 23d March the special agent, Heaton, wrote to the seventh agency, and on the' 28th March to the Secretary of the Treasury, that, in consequence of the unseaworthiness of the Philadelphia, the cotton had been in part shipped to New York, where “the rights of the government in the case and that of the claimants can be fully tried.”
On the 30th April two hundred and thirty-five bales of the cotton arrived in New York, and on the 27th April the balance.
On 'the 25th May the Philadelphia was libelled on the information of the United States in the United States district court for the District of Columbia. On the 11th J uly the Secretary of the Treasury, upon the application of the claimant, ordered the agents of the government in New York to deliver to the claimant “ the said cotton on the payment by him of all lawful and proper expenses incurred in handling, transportation, and care of the same, and on the execution by him of a paper which will protect you and all officers of the government from any legal action for the part taken in the premises.” On the 22d July the claimant received from Murray & Nephew, the agents of the government in New York, two hundred and fifty-two bales of cotton, weighing 114,381 pounds, and gave to them the following receipt:
“ Messrs. Murray & Nephew, of New York, in pursuance of the letter of the Secretary of the Treasury addressed to them, dated J uly 11, 1865, of which the foregoing is a true copy, having delivered to me the two hundred and fifty-seven (257) bales of cotton (121,640 pounds) referred to in said letter, I hereby release the said Murray & Nephew, and all officers of the government, from any legal action for the part taken by them, respectively, in relation to said cotton.
“ GEORGE W. LANE.
“ New YoRK, July 22, 1865.”
*194 At tbis time the cotton was wortb but forty-six cents per pound, and the claimant, when he gaye the receipt, notified the agents “ that he should pursue his remedy for the difference between the value of the cotton at the time of its seizure and at the time of its redelivery to him, in the Court of Claims or before Congress, and he never would be satisfied until he obtained his rights.”
The claimant’s steamer Philadelphia was sent by Heaton to Washington, D. 0., where she was libelled in the supreme court of the District of Columbia, sitting in admiralty. And on the final hearing of the cause, on the 13th December, 1865, the libel was dismissed, with costs, and the vessel and her papers ordered to be delivered to the claimant.
The claimant contends that if his voyage had not been interfered with aDd broken up by the seizures and detentions detailed in this statement of facts, he would have arrived at Norfolk about the 12th January, 1865, and have delivered the cotton on board to Mr. Bisley, the treasury agent, and, in accordance with his contract, received for it one dollar and eighteen cents per pound, the j>rice at that date in New York, less one-fourth, to be deducted for the use of the United States. That his cotton was unlawfully and oppressively detained from him until the 20th July, 1865, when it had fallen to forty-six cents per pound. The difference between what he would have received if he had been permitted to complete his voyage and deliver the cotton to Bisley, at Norfolk, and the price at the date of redelivery to him in New York, constitutes the claim in this case.
He bases his right to recover on three grounds:
1st. That the appointment of Upton as agent on board, or supercargo of the vessel, and the delivery of the cotton to him on board at the Chowan river, was a delivery to the United States under the contract, and entitled him to be paid the stipulated price.
2d. That the delivery over of the cotton by the naval officers to Heaton, a purchasing agent of the Treasury Department, aud his shipment of it to New York on behalf of the United States, may be taken and regarded as a delivery under the contract, as at the port of Norfolk.
3d. That the recognition and adoption of the acts of the naval commanders by the United States, and through which he was prevented from fulfilling the contract, entitles him to be compensated in damages for the loss sustained. Prevention, in that case, standing for performance.
I. The appointment of Upton to accompany the vessel on her voy *195 age may have been a wise and proper precaution to enforce a due observance of the law and regulations on the subject of this intercourse. But it did not change the place of delivery mentioned or implied in .the contract. Nor, indeed, could Risley have made au agreement which could have fixed the place of delivery on the Chowan river, within the rebel lines,'or at any other than a place designated by the Secretary of the Treasury, under the provisions of section 8, act 2d July, 1864. — (13 Stat., 377.)
II. The delivery to Heaton was not in pursuance of the contract, but in hostility to and repudiation of-jts terms.' It was delivered by the naval officers to him, under act 12th March, 1863, as captured and abandoned property, and so held and treated by him. Nor was it so regarded by the claimant himself. His efforts and applications to the higher authorities of the United States were all based on the idea that his property was unjustly and improperly held and detained ; not for payment of an agreed price, as upon an executed sale and delivery, but for its release as unlawfully withheld from his possession. In this he finally succeeded ; both parties concurring in the same view. It is now too late to say that it was a sale and delivery.
III. If the plaintiff has any cause, it must rest upon the breach and not upon the fulfilment of the contract. Against the liability of the United States for the damages resulting to the claimant, the solicitors interpose the objection that such injury resulted from the unlawful and unauthorized acts of the naval commanders. That for such acts the officers themselves are personally responsible, but for which the government is in no way amenable. They rely on the ruling of the Supreme Court of the United States in the case of Mitchell v. Harmony, 13 Howard, 115. It is true that where a public officer, while engaged in the public service, by an unauthorized and unlawful act does an injury to a citizen, the government is not responsible, hut where the government afterwards adopts and ratifies the acts it is equivalent to a precedent authority. And such ratification and adoption not only make the government liable, but discharge the officer. This question was much discussed in the case of Buron v. Denman, 2 Exch. Rep., 167; -and decided in accordance with the principle just stated. The plaintiff in that case was a Spaniard, who carried on the slave trade at the G-allinas, on the western coast of Africa. He had barracoons or slave marts along the coast. The defendant was a commander in the royal navy. In carrying out some instructions of his superior officer in relation to the liberation of a woman and her child, British subjects held in that country, he de *196 stroyed tbe plaintiff's barracoons, and released a large number of slaves held there by the plaintiff. Upon report made to the government, the conduct'and action taken by Commander Denman in the premises was distinctly approved, and his conduct commended, by the ministers of state and the lords of the admiralty. And though the court held that his conduct was unlawful and unauthorized, yet the act being approved and adopted by the government afterwards, made it an act of state, for which the government was alone responsible. The same doctrine is maintained in the case of the Rolla, 0 Rob., 364. In that case Lord Stowell says : “ However irregularly he may have acted towards his own government, the subsequent conduct of government in adopting that enterprise by directing a further extension of that ■conquest, will have the effect of legitimating the acts done by him." Every ratification has relation back to the time of the act done. (Best on Pres., 28; notes to Potter v. North, 1 Saund,, 347 c.; Elphinstone v. Bedrechund, 1 Knapp, 316. Story on Ag., § 244.)
Were the acts of Admiral Porter and Commander Rowan in seizing this vessel and cargo ratified and adopted by the United States ? We think they were. The matter of the seizure was reported to the Secretary of the Navy, who took no action or gave no response to the report. But these officers, instead of retaining the vessel and cargo in their own possession, or in that of the Navy Department, or subject to its orders, delivered both over into the hands of the agent of the Treasury Department. This officer reported the fact promptly to the Secretary of the Treasury, who, acting for the President in that regard, recognized the seizure, and directed such disposition of ■the property as was incompatible with any other view of the case than a clear and distinct affirmance of what had been done by these naval officers. Two courses were open to the executive department of the government — eithér to adopt the acts of seizure by retaining the property, or to restore it to the claimant. The United States through its highest executive authority, expressly authorized by law of Congress to deal with the question, determined the matter. They made their election, and on that the relative rights of the government and claimant must rest. To make this adoption and ratification clear and explicit beyond all denial or controversy, under the same authority the vessel is libelled in a court of the United States and the suit prosecuted in the name and on behalf of the United States by her own officers and agents, duly constituted for that purpose. So that in every way there appears to have been the fullest and clearest *197 recognition of the acts which are the source and ground of the injury to the claimant.
Taking this view of the case it is unnecessary for us to inquire into the views and motives which influenced the conduct of the naval authorities. We should be unwilling, except upon the clearest and most convincing proofs, to believe that gentlemen so distinguished in the service of their country could he influenced by any but the highest and best of considerations. The evidence, we think, discloses nothing to their discredit in any respect, except a superabundant zeal to guard against any illicit’ trading or communication with the public enemy, coupled with a misapprehension of the rights of a party situated as was the claimant in this ease. It was in our judgment, therefore, highly proper that the government should step in and assume the responsibility and relieve those whose only fault was an excess of zeal in the cause of the country.
The suggestions that the outward cargo contained articles contraband of war, and that a file of rebel soldiers were taken on board after the vessel had passed the Union lines, deserve only a passing-notice. It -was the business and duty of the revenue officers or treasury agents to supervise the trade authorized to be permitted by license from the President, with the approval of the military commander of the district. This was strictly complied with in this case. The schedule or invoice of the articles was attached to the order or permit of G-eneral Shepley. The order was signed. It was not necessary that the schedule should be signed, for it constituted a part of the order as much as if it had been incorporated in it. The other suggestion, of having taken rebel soldiers on board, is made in forgetfulness of the facts that the contract, license, permits, and whole object of the arrangement was to obtain products of the insurrection-ary States, situated outside of the Union lines and from within the territory held by hostile forces. The object of the law of Congress and of the contract was to legalize .a certain traffic with the enemy. That could not be carried on without communicating with them to some extent. And no citizen would undertake any such traffic without some assurance beforehand that his person' and property should be inviolate while within the hostile lines. This he would stipulate for beforehand. And the guard of rebel soldiers within the rebel lines was a necessary "incident to the trade which Congress had authorized. But it is unnecessary to argue these questions or attempt to show that the voyage was conducted in a proper and legal manner. That question is not an open one. It has passed beyond the *198 reach of controversy by the decision of the supreme court of the District of Columbia, sitting in admiralty, in the case of the claimant’s vessel, the Philadelphia. It was the- judgment of a court of competent jurisdiction on the same subject-matter, between the same parties, and is therefore as a plea a bar, and as evidence conclusive of the same matter coming in question in this court. It has passed in rem judieatum, and must therefore be considered as finally and definitively settled.
Between individuals the law of this case Vould be clear. Prevention is equivalent to performance as against the party in the wrong. Why should another or different rule be applied when one of the parties is a sovereign State ? When the existence of a contract with the public and the authority to make it are undisputed, the same rules of interpretation and construction that obtain in other cases are applied. The same terms in an agreement with the government impose the same obligations as if both were individuals. The principles of justice, and the rules of right, by which such contracts are defined and their obligations measured, ought to be exemplified in the conduct, as well as enforced by the authority, of every just government. Hence we cannot concur in imputing to the United States the double character of a contracting party and a sovereign in reference to the same transaction, whereby they may assume the obligation in the one capacity, and repudiate and annul it in the other. This would be glaringly unjust. The case of Jones and Brown, 1 0. C. B.., p. 383, does not sustain such a doctrine. That decision only holds that the measures of government unconnected with the subject-matter of the contract, and which had the incidental effect to make it more difficult of performance, and less profitable to the contractor, was not a ground of relief; but if the military authorities of the United States in that case had actually interfered, and by force prevented the completion of the work, and the United States had approved and adopted such acts, the cases would have been parallel, and I may venture to suggest that the case cited might probably have been decided differently. Besides, here the acts were not, as there, in pursuance of any general authorized public policy of the United States, but in direct opposition to and disobedience of both the measures of Congress and the mandates of the Executive.
A majority of the court therefore are of opinion that the claimant ought to recover from the United States the difference between what his cotton was worth when redelivered to him on the 22d July, 1865, and what he would have received under the contract with Risley if *199 the voyage had not been interfered with. In making this estimate we allow to the government and her officers a reasonable time to overhaul the vessel and assure themselves of the character of the vessel, the innocence of the voyage, and the regularity and genuineness of the papers. Taking the time and' place, and circumstances of the seizure, we should say ten days would be sufficient to make every necessary inquiry, and gain all requisite information. The seizure was made on the 10th January, 1865, and this allowance carries it to the twentieth day of the same month. The average price of cotton on that day, in New York, was ninety-six cents; this is therefore the price at which it should be valued, deducting one-fourth to which the United States were entitled under the contract. From the other three-fourths is to be deducted the value of the cotton when it was delivered up to him in New York, in July, 1865, which the evidence shows was forty-six cents; and the balance will constitute the amount to which the claimant is entitled.
The calculation stands thus:
121,640 pounds cotton, at 96 cents. $116, 774 40
Deduct one-fourth for United States. 29,193 60
Net proceeds to claimant at Norfolk. 87, 580 80
Deduct price of cotton when received by claimant in New York, 121,640 pounds, at 46 cents. 55, 954 40
Balance due claimant. 31,626 40
We therefore find in favor of the claimant, and assess his damages at the sum of thirty-one thousand six hundred and twenty-six dollars and forty cents, ($31,626 40.)